**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 22-199-1** |
| **FRANK HAMILTON** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Frank Hamilton led a broad conspiracy that defrauded a wide array of banks and other lenders, as well as the Small Business Administration ("SBA"), by fraudulently obtaining numerous loans. Hamilton and his conspirators started with SBA 7(a) loans prior to the COVID-19 pandemic and then transitioned to Economic Injury Disaster Loans ("EIDLs") and Paycheck Protection Program ("PPP") loans during the pandemic, taking advantage of an emergency relief effort for their own benefit. To obtain these loans, the conspirators submitted false loan applications. In addition, they provided fake documents to support the false applications. As a result of this deceptive activity, Hamilton and his co-conspirators secured more than $7 million in fraudulent loan proceeds. As planned, the conspirators turned over the majority of these proceeds to Hamilton so that he could invest the funds for them. While Hamilton returned some of these funds to the conspirators, he kept most for himself.

In addition to helping his co-conspirators obtain fraudulent loans, Hamilton applied for multiple fraudulent loans in the names of four of his companies. Notably, three of these companies, Berkeley Marketing Group LLC ("BMG"), KLMN Little Hands ("KLMN"), and Historic Concepts LLC ("Historic Concepts"), were shelf companies that had no functioning business or employees. The fourth, Nubela USA Inc. ("Nubela"), was a functioning company,

but it had little actual revenue and few actual employees. Through these loan applications, Hamilton sought and obtained approximately $1,290,459 in fraudulent loan proceeds.

Altogether, through both the loans that Hamilton assisted and his own fraudulent loans, Hamilton caused more than $7 million in losses to banks, lenders, and the SBA. For these reasons, as well as for the reasons provided below, the government recommends a sentence within the advisory guideline range of 97 to 121 months' imprisonment, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted); *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority."); *United States v.*

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

*Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I. **BACKGROUND**

On September 21, 2022, the defendant pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. During his plea colloquy, the defendant admitted that he filed four fraudulent applications for SBA loans, all of which were funded for a total of $1,290,459. In addition, he admitted that he assisted co-defendants Peter An, Edwin Bonilla, Tina Chen, Joseph Greco, Frank Hamilton, Timothy Park, and Kenny Tran, as well as co-conspirators Leslie Murray (charged elsewhere), Le Chu Valdivia (charged elsewhere), and at least one other co-conspirator file their own fraudulent loans. After loans were funded, loan participants sent Hamilton most or all of the proceeds of the loans, some of which he returned to them and much of which he retained for himself.

As explained in greater detail in the Presentence Report and the government's plea memorandum, the defendant acknowledged that three types of SBA loans were involved in the conspiracy: 7(a) loans, EIDL loans, and PPP loans. These loans had the following purposes and requirements:

1. 7(a) loans were available prior to, during, and after the pandemic. These loans, which were funded by lenders and partially guaranteed by the SBA, were intended to assist small businesses that might not be able to obtain financing at a reasonable rate. The SBA used the following information in the applications for

      these loans to determine whether the applicant qualified for the loan: the number of company employees, the company's annual revenue for the prior three years, the company's need for the loan, and a commitment to use the funds for a business purpose.

2.     EIDL loans and EIDL Advance loans were in existence prior to the pandemic, but expanded to address small business owners needs during the pandemic. The SBA could fund EIDL advance loans up to $10,000, and fund EIDL loans up to $2 million. In order to obtain these loans, applicants had to certify that they provided accurate information about a company's operations, including its number of employees, gross revenue, and cost of goods sold for the 12 months preceding the economic disaster.

3.     PPP loans were intended to enable existing businesses to retain their current employees during the pandemic. In order to obtain an initial PPP loan, an authorized representative of a business had to acknowledge the program's rules, including that the business needed to have been in operation for a certain number of years, and to state, among other things, its average monthly payroll expenses and number of employees. Furthermore, documentation, usually including business tax returns, was required to substantiate payroll expenses. PPP loans were funded by lenders using their own money, and were one hundred percent guaranteed by the SBA. In order to obtain approval, businesses were required to use PPP loan proceeds on certain specific expenses, including payroll. Prior to June 5, 2020, PPP loans were eligible for loan forgiveness if the businesses spent 75 percent of the loan on payroll within a designated period—usually eight weeks

after receiving the proceeds. After that date, the requirement dropped to 60 percent. A second draw was also possible if loan requirements were met.

The conspiracy charged in this case was headed by a Florida accountant who prepared documents supporting fraudulent SBA loans for customers throughout the United States, including Frank Hamilton, who was based in California. Hamilton recruited associates to apply for these loans. (He knew these individuals from his church, stock trading classes, or both.) There was no actual business purpose for these loans, as required. Rather, Hamilton and his recruits' intent was to use the funds to invest in the stock market and for their personal use.

Significantly, most of the conspirators did not have a functioning business. As a result, Hamilton and co-conspirator Michael Jones assisted many of them in obtaining a "shelf company," that is, a company that had been created by a vendor who registered a non-functioning business in a state with minimal corporate regulations, paid all required fees for several years, and then sold the company "off the shelf" so that it could be used by individuals who needed to make it appear that they had a company that had been in business for a significant length of time. Co-conspirator Jones assisted co-conspirators by, among other things, obtaining shelf companies, creating websites, phone numbers, and emails for their non-functioning or minimally functioning businesses.

Hamilton and Jones assisted the co-conspirators with opening bank accounts for those businesses. Moreover, Hamilton and Jones secretly participated in the co-conspirators' phone interviews with lenders so that they could text the co-conspirators' answers to the bank interviewers' questions. Furthermore, in order to make their fraudulent applications and back-up appear more authentic, Hamilton used the names of other co-conspirators and/or the names of co-conspirators' non-functional companies in the applications and back-up documents as

employees or vendors of each other's companies. As a result of this sophisticated fraud, Hamilton's co-conspirators (Michael Jones, Peter An, Edwin Bonilla, Tina Chen, Joseph Greco, Timothy Park and Kenny Tran, and others) all submitted fraudulent loan applications prepared by the Florida accountant with Hamilton's assistance, and approximately $7 million of those loans were funded.

In addition to assisting other conspirators obtain fraudulent loans, Hamilton himself applied for fraudulent loans. As noted above, he applied for these loans in the names of his own companies, which had either no or minimal business functions, actual employees, expenses, or revenue. These loan applications included a 7(a) loan for $268,000 for his minimally functioning company Nubella, which was denied. Hamilton also applied for PPP loans for Nubella, as well as for three of his own non-functioning shelf companies: BMG, KLMN, and Historic Concepts. Each of these applications falsely stated the companies' number of employees, revenue, and expenses, as well as the time that the companies had been in business.

Furthermore, Hamilton submitted false tax returns prepared by the Florida accountant with these applications. All four of these fraudulent PPP loans, which totaled $1,290,459, were funded:

    (i)    a loan for Nubella funded by Bank H for $416,624;

    (ii)    a loan for BMG funded by Bank D for $257,832;

    (iii)    a loan for KLMN funded by Bank H for $363,536; and

    (iv)    a loan for Historic Concepts funded by Bank D for $252,467.

Notably, during the preparation of the loan application for his company Nubela, Hamilton sent emails to the Florida accountant requesting that in order to obtain the most money possible, the accountant falsely list non-functioning shelf companies owned by all seven of his co-defendants

as independent contractors for Nubela, and that the false tax return used as part of the loan process include as contractors the names of co-defendants Jones, Park, Tran and An.

After receiving loans as a result of fraudulent applications in which they agreed to use loan proceeds for authorized purposes, the co-conspirators continued the scheme by using the proceeds for unauthorized purposes.

- For instance, for the 7(a) loans, the conspirators agreed that the borrowers would keep a small percentage of loan proceeds themselves and give the majority of the money to Hamilton to invest in the stock market on their behalf. The agreed to plan was that Hamilton would then send the borrowers enough money each month to make the loan payment, plus a small additional percentage for the borrowers to keep.
- For the PPP loans, which were supposed to be used primarily for payroll, Hamilton directed his co-conspirators to send the majority of fraudulently-obtained loan proceeds to Historical Concepts, one of Hamilton's non-functioning companies. Hamilton instructed the co-conspirators to falsely note on the wire transfers that their purpose was payroll so that the co-conspirators could qualify for forgiveness of these PPP loans at a later time. In most instances, if forgiveness was granted, Hamilton was supposed to (i) use the funds transferred to him to invest in the stock market on behalf of the borrower or (ii) return the funds to the borrower.
- For the EIDL loans, in most instances Hamilton instructed the borrowers to send him all of the proceeds, and he promised to make the payments on these loans.

Hamilton did not fulfill his obligations.

- For instance, for the 7(a) loans, he repaid some of the borrowers the money that they had transferred to him for investment, but not all.[2]
- For the PPP loans, Hamilton did not return the majority of the PPP loan proceeds that his co-conspirators had forwarded to him as "payroll."
- For the EIDL loans, in most instances Hamilton retained the proceeds. He did not make any payments to the SBA. And he did not pay the proceeds back to most of the borrowers.
- Hamilton's repayment of his own loans was no better. He did not repay them.

In summary, Hamilton's co-conspirators gave him the majority of funds that they obtained from their fraudulently-obtained loans. As a result, most of them did not have the funds to repay those loans if Hamilton did not return the money they paid him. Although Hamilton had the funds to make loan payments, he chose not to do so. Thus, the loans were not repaid. For this reason, the government lost more than $7 million on the loans referenced in the Information.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

The maximum sentence that may be imposed on the defendant is a term of imprisonment of 20 years, a term of supervised release of three years, a fine of $250,000, and a special assessment of $100. Also, the parties have agreed to recommend that restitution of $7,080,010, less any loan payments made prior to sentencing, should be ordered.

### B. Sentencing Guidelines Calculation

[2] Despite the fact that Hamilton did not pay them their fraudulent loan proceeds, some of the co-conspirators made payments on the loans. Others did not.

**1. The Sentencing Guidelines Calculation**

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---|
| Base offense level, USSG § 2X1.1(a) and 2B1.1(a)(1) | 7 |
| Loss between $3,500,000-$9,500,000, USSG § 2B1.1(b)(1)(H) | 18 |
| Sophisticated means, USSG § 2B1.1(b)(10)(C) | 2 |
| Loss of more than $1,000,000 to financial institutions USSG § 2B1.1(b)(17)(A) | 2 |
| Manager or supervisor of 5 or more people, USSG § 3B1.1(a) | +4 |
| Offense level | 33 |
| Acceptance of Responsibility, USSG § 3E1.1(a) | -2 |
| Assisting in prosecution of own misconduct, USSG § 3E1.1(b) | -1 |
| Total Offense Level | 30 |

Guideline level 30, Criminal History Category I results in a sentencing range of 97 to 121 months' imprisonment.[3]

**2. The Defense Objection to the Presentence Report**

In the plea agreement in this case, the defendant reserved the right to object to the government's position that a 4-level increase for leadership role in the offense should apply. He subsequently submitted an objection to the Probation Office's determination that the 4-level

---

[3] Due to the defendant's upward adjustment for his role as manager or supervisor he is not entitled to an adjustment for zero-point offender. USSG § 4C1.1(a)(10).

increase "for being an organizer or leader of criminal activity that involves five or more participants" pursuant to USSG § 3B1.1(a) applies. He argues that the 3-level increase pursuant to USSG § 3B1.1(b) for being "a manager or supervisor (but not an organizer or leader) and the criminal activity involves five or more participants" should apply instead.

The government agrees with the Probation Office's explanation that the defendant, along with the Florida accountant, led the conspiracy that involved his seven co-defendants, as well as two other charged individuals and another co-conspirator. Hamilton convinced people he knew from church and stock trading classes to join the conspiracy, oversaw the loan application process, helped them obtain shelf companies, bank accounts, email addresses, and websites for their fake businesses, coached them in preparation for bank interviews, and laid out the plan for how they should use the fraudulent loan proceeds. As a result of the defendant's plan, he was able to obtain control of the majority of the money obtained by the conspiracy participants. The defendant was more than a manager or supervisor; he was in fact the embodiment of an organizer and leader. For these reasons, the 4-level increase is appropriate.

## III. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-

Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A. Consideration of the 3553(a) Factors

#### 1. The Nature and Circumstances of the Defendant's Crimes

The defendant engaged in a serious offense. He caused more than $7 million in loss to the government, not only through his own fraudulent loans, but through his recruitment of other borrowers whom he knew from church and stock trading classes to join the scheme. He and his co-conspirators filed numerous false applications for loans for which they were not qualified. They falsely represented their fictitious businesses' number of employees, revenue, and expenses. They submitted false tax returns. Moreover, Hamilton directed that his co-conspirators turn over the vast majority of their loan proceeds to him, but he did not return most of these funds to them. As a result, co-conspirators defaulted on the majority of these loans, and Hamilton

kept most of the money. By doing so, a substantial amount of taxpayer money was lost. Perhaps even more importantly, by committing fraud in programs designed to help small businesses and keep people employed during an economic disaster, it may be more difficult for qualified businesses to obtain needed funds during future times of need. For this reason, as well as to deter others from engaging in the same type of loan fraud, a sentence within the guideline range is appropriate.

**2. The History and Characteristics of the Defendant**

The defendant is 55 years old. He is originally from Chicago. Because his father was not in his life, and his mother was bipolar and not stable enough to care for him, he was raised initially by his grandparents. He described his childhood as "normal." As a teenager, he moved with his mother to California. Although he withdrew from high school, he later obtained an associate degree in electronics. The defendant has been a day trader in the stock market for more than a decade. He has been married for more than 20 years, and has four children whose ages range from 16 to 27 years old. He lives in a four-bedroom home with a swimming pool in California.

In view of the defendant's self-described "normal" childhood, stable marriage, and family life, nothing in his history or personal characteristics would provide the basis for a variance from the sentencing guidelines.

**3. The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and To Provide Just Punishment for the Offense**

It is important that the sentence imposed on Hamilton reflect the seriousness of his role leading a more than $7 million fraud upon the government. The funds that they obtained through fraud had been allocated to support small businesses during the pandemic. This offense limited

the funds available to genuine business applications and contributed to the erosion of trust in the relief programs that were designed to help small businesses. A guideline sentence would reflect the seriousness of the offense and promote respect for the law.

**4. The Need for Adequate Deterrence and Protect the Public from Further Crimes by the Defendant**

There is need for specific deterrence for this defendant. As the events in this case indicate, the defendant is clearly capable of persuading others. As a charismatic leader of church groups, he was highly respected by his fellow church members. He was similarly well regarded by those he met through stock trading classes, as he appeared to be the top student in those classes. The high regard in which he was held enabled him to recruit others to the loan fraud scheme. He needs to be deterred from engaging in similar conduct in the future.

The need for deterrence under Section 3553(a) is not limited to deterrence of the particular defendant, however. As the courts have noted, general deterrence and respect for the law are also factors which the courts may consider. *See, e.g.*, *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); *United States v. Glover*, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-*Booker* and post-*Booker*, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); *see also United States v. Yeaman*, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation"). Here, general deterrence is particularly important. The defendant committed a $7 million fraud. Other defendants enticed by greed should be sent a message that should conduct will be severely punished.

For these reasons, a sentence within the guideline range would provide deterrence to both this defendant as well as others who consider engaging in loan fraud.

**5. The Need To Avoid Disparities**

While every case is unique, the government's recommended sentence will avoid unwarranted sentencing disparities. The guidelines themselves "are designed to restrain unwarranted disparities." *United States v. Sample*, 902 F.3d 1196, 1201 (10th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 54 (2007)). That is what the government requests here. 18 U.S.C. § 3553(a)(4), (a)(6). The guidelines here appropriately account for the defendant's conduct and leadership and reflect potentially mitigating factors, such as his willingness to accept responsibility for his actions by giving him credit for accepting responsibility. Of the co-conspirators facing sentencing, Hamilton is certainly the most culpable and his sentence should reflect that.

**6. Educational or Vocational Training and Medical or Correctional Treatment**

As explained above, the defendant has received a certificate in electronics, has taken multiple stock trading training programs and is currently enrolled in an online program at Eternity Bible College where he is pursuing a bachelor's degree in theology. The defendant, therefore, is not in need of educational or vocational training.

The defendant has hypertension and asthma and is on medication. He also takes weekly hormone treatments. He has periods of depression, which he treats effectively with meditation. He does not currently have a primary care doctor, and it appears that any of his medical conditions can be treated if he is incarcerated.

**7. The Kinds of Sentences Available**

As stated previously, the defendant is subject to a prison sentence. He could receive supervised release. He is not eligible for probation. He could receive a fine. A special assessment of $100 is mandatory.

**8. Restitution**

Restitution of $7,080,010, less any loan payments that have been made prior to sentencing, should be ordered in this case.[4]

For the reasons stated above, all of the appropriate considerations of sentencing favor the imposition in this case of a within-guideline sentence. As noted, the Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 569 U.S. at 544, and that guide is once again persuasive in this case.

**B. Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

[4] The government will provide the names and addresses of victims in this case, as well as the amounts due to those victims. Most restitution payments will be joint and several with defendant Jones as well as at least one additional co-defendant.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of three years is warranted. A term of supervised release will aid the defendant's reentry to society, and will advance the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), assure that the defendant receives treatment for his physical and mental health conditions, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7).

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as these additional conditions: The defendant shall participate in mental health treatment if directed to do so by the Probation Office; the defendant shall provide the probation office with regular reports of his finances; he shall not obtain any new loans or credit without permission of the Probation Office; he shall not liquidate or encumber any asset without permission of the Probation Office.

## IV. CONCLUSION

The government's final recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Judy Smith*
JUDY SMITH
Assistant United States Attorney

MARGARET A. MOESER
Chief, Money Laundering, Narcotics & Forfeiture Section

*/s/ Varun Trivedi*
VARUN TRIVEDI
Trial Attorney, Money Laundering, Narcotics & Forfeiture Section

**CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served by email on Pat Harris, Esq. at pat@patharrislaw.com.

*/s Judy Smith*
JUDY SMITH
Assistant United States Attorney

DATED: March 12, 2026